UNITED STATES DISTRICT COURT

NORTHERN DISTRICT OF CALIFORNIA

| | |
|---|---|
| MONSTER, INC.,<br><br>    Plaintiff,<br><br>vs.<br><br>DOLBY LABORATORIES LICENSING CORP.,<br><br>    Defendant. | Case No.: 12- cv-2488-YGR<br><br>**ORDER DENYING MOTION OF MONSTER, INC. FOR SUMMARY JUDGMENT AND GRANTING MOTION OF DOLBY LABORATORIES LICENSING CORPORATION FOR PARTIAL SUMMARY JUDGMENT** |

Plaintiff Monster, Inc. ("Monster") filed its operative amended complaint for declaratory relief September 4, 2012 ("FAC," Dkt. No. 42) seeking a judicial declaration that the Monster Headphone Mark does not infringe any trademark rights of Defendant Dolby Laboratories Licensing Corporation ("Dolby") in its Dolby Headphone Mark. Monster's FAC alleges entitlement to declaratory relief on the following grounds: (*i*) no likelihood of confusion exists and therefore no trademark infringement under federal law, 15 U.S.C. § 1114, and California law, California Business & Professions Code § 14245 *et seq.*; (*ii*) no unfair competition occurred; and (*iii*) abandonment and cancellation of federal registration under 15 U.S.C. § 1119.[1] Dolby filed its answer to the FAC on September 18, 2012. ("Dolby's Answer," Dkt. No. 52). Dolby's answer to the FAC raises affirmative defenses including licensee estoppel.

Dolby filed its counterclaim on April 9, 2012 ("Cross-Complaint," Dkt. No. 12). The Cross-Complaint alleges claims for federal trademark infringement, 15 U.S.C. § 1114 *et seq.*, federal unfair competition, 15 U.S.C. § 1125; and California Unfair Competition, Cal. Business & Professions

---

[1] Monster also alleged "no dilution claims" which it withdrew subsequently. (*See* Dkt. Nos. 46, 49.)

Code § 17200. Monster's answer to the Cross-Complaint (Dkt. No. 15) raises an affirmative defense that "Dolby's claims are barred because the use of headphones as a design element in a mark used in connection with consumer electronics products is not a protectable element of a mark because it is generic and/or aesthetically functional."

The Court held a hearing on December 18, 2012. Attorneys Gabriel Gross and Douglas E. Lumish of Kasowitz, Benson, Torres & Friedman LLP appeared for Monster. Attorney George A. Riley of O'Melveny & Myers LLP appeared for Dolby.

Having carefully considered the arguments of the parties, the papers submitted, the evidence presented, and the pleadings in this action, and for the reasons set forth below, the Court hereby **DENIES** Monster's Motion for Summary Judgment and **GRANTS** Dolby's Motion for Partial Summary Judgment.

## I. MONSTER'S MOTION FOR SUMMARY JUDGMENT

### A. Standards Applicable to the Motion

Monster moves for summary judgment on the grounds that no evidence supports Dolby's claims of likelihood of confusion and therefore the Cross-Complaint should be dismissed. Because of the "intensely factual nature of trademark disputes," summary judgment is generally disfavored in trademark cases and should be granted "sparingly." *Rearden LLC v. Rearden Commerce, Inc.*, 683 F.3d 1190, 1202 (9th Cir. 2012) quoting *Interstellar Starship Servs, Ltd. v. Epix Inc.,* 184 F.3d 1107, 1109 (9th Cir. 1999). Despite this disfavor, "summary judgment may be entered when no genuine issue of material fact exists." *Surfvivor Media, Inc. v. Survivor Productions*, 406 F.3d 625, 629-30 (9th Cir. 2005) *citing Thane Int'l, Inc. v. Trek Bicycle Corp.,* 305 F.3d 894, 901-02 (9th Cir.2002).

Here, Monster's motion seeks judgment on Dolby's Cross-Complaint, as to which Dolby would ultimately bear the burden of proof at trial. Thus, a grant of summary judgment on the cross-complaint in Monster's favor only requires that Monster identify a lack of evidence supporting likelihood of confusion. *See Matsushita Elec. Indus. Co. v. Zenith Radio Corp.*, 475 U.S. 574, 587 (1986); *Celotex Corp. v. Catrett,* 477 U.S. 317, 323 (1986); *Cohn v Petsmart, Inc.,* 281 F.3d 837, 842

2

(9th Cir. 2002).[2]   Dolby must then respond with "sufficient evidence to permit a rational trier of fact to find that confusion is 'probable,' not merely 'possible.' *M2 Software, Inc., v. Madacy Entm't,* 421 F.3d 1073, 1084 (9th Cir. 2005) citing *Murray v. CNBC,* 86 F.3d 858, 861 (9th Cir.1996); *see also Cohn*, 281 F.3d at 842; *Fortune Dynamic*, *Inc. v. Victoria's Secret Brand Management, Inc.*, 618 F.3d 1025, 1031 (9th Cir. 2010).

**B.     Establishing Likelihood of Confusion**

"The test for likelihood of confusion is whether a 'reasonably prudent consumer' in the marketplace is likely to be confused as to the origin of the good or service bearing one of the marks." *Dreamwerks Prod. Group, Inc. v. SKG Studio,* 142 F.3d 1127, 1129 (1998).  In determining whether to grant summary judgment on the question of likelihood of confusion, courts look to the factors set forth in the Ninth Circuit's decision in *AMF, Inc. v. Sleekcraft Boats,* 599 F.2d 341 (9th Cir.1979) *abrogated on other grounds by Mattel, Inc. v. Walking Mountain Productions*, 353 F.3d 792 (9th Cir. 2003) ("*Sleekcraft*").  Those factors include: (1) strength of the mark; (2) proximity of the goods; (3) similarity of the marks; (4) evidence of actual confusion; (5) marketing channels used; (6) type of goods and the degree of care likely to be exercised by the purchaser; (7) defendant's intent in selecting the mark; and (8) likelihood of expansion of the product lines. *Rearden LLC v. Rearden Commerce, Inc.*, 683 F.3d 1190, 1199 (9th Cir. 2012) citing *Sleekcraft*, 599 F.2d at 348-49.

A party need not demonstrate that every factor favors it in order to prevail.  *Surfvivor Media* 406 F.3d at 631.  That some factors may favor the non-moving party does not necessarily mean that a triable issue of fact exists as to likelihood of confusion.  *Chesebrough-Pond's, Inc. v. Faberge, Inc.*, 666 F.2d 393, 398-99 (9th Cir. 1982).  Some *Sleekcraft* factors bear more heavily on the analysis than others, and the relative weight may vary depending on the nature of the case.  *See M2 Software, Inc., v. Madacy Entm't,* 421 F.3d 1073, 1076, 1080 (9th Cir. 2005)*; Brookfield,* 174 F.3d at 1054.  Depending upon the specific facts at issue, likelihood of confusion can be established based solely on two or three factors where there is a strong enough showing.  *See Lindy Pen Co., Inc. v. Bic Pen*

---

[2] While Monster did not expressly move for summary judgment on its own complaint for declaratory relief, it contends that a finding of no likelihood of confusion would result in judgment in its favor on those declaratory relief claims as well.  Because the Court finds that there are triable issues of fact, it need not decide the question of whether Monster is required to meet the evidentiary burden applicable to a party seeking summary judgment affirmatively on claims as to which it would bear the burden at trial.

3

*Corp.*, 796 F.2d 254, 257 (9th Cir. 1986) (finding district court's conclusion of no likelihood of confusion was "clearly erroneous" where two key factors favored the plaintiff, even though five other factors did not); *Park 'n Fly, Inc. v. Dollar Park & Fly, Inc.*, 782 F.2d 1508, 1509 (9th Cir. 1986) (finding likelihood of confusion based upon strength of showing on two factors—similarity of the marks and convergent marketing channels–despite lack of evidence on other factors).

Courts have noted three general types of proof of likelihood of confusion: (1) survey evidence; (2) instances of actual confusion; and (3) inferences arising from the characteristics of the marks themselves and their use in the relevant marketplace context. *See Dr. Seuss Enterprises, L.P. v. Penguin Books USA, Inc.*, 109 F.3d 1394, 1404 (9th Cir. 1997.) "In a close case amounting to a tie, doubts are resolved in favor of the senior user." *Id.*

Monster argues that its survey evidence here, and the lack of survey evidence supporting Dolby's contentions, strongly favors a summary finding of no likelihood of confusion. Undoubtedly, survey evidence is "often the most persuasive" evidence concerning likelihood of confusion. *Cairns*, 24 F.Supp.2d 1041. Moreover, a trier of fact may be entitled to presume that one party's failure to conduct a survey concedes that the survey evidence would be unfavorable to it. *Id.*. However, survey evidence is not required to show likelihood of confusion. *Midwestern Pet Foods, Inc. v. Societe des Produits Nestle S.A.,* 685 F.3d 1046, 1054 (Fed Cir. 2012); *Cairns v. Franklin Mint Co.*, 24 F. Supp. 2d 1013, 1041 (C.D. Cal. 1998). The existence (or non-existence) of such evidence does not allow the Court to forego an analysis of the *Sleekcraft* factors.

**C.     Analysis of *Sleekcraft* Factors**

For purposes of this motion, the parties do not dispute the impact of four of the eight factors on the Court's analysis. Thus, with respect to proximity of the goods in the marketplace, marketing channels used, and likelihood of expansion into overlapping areas (factors 2, 5, and 8, above), the parties concede, for purposes of this motion, that these factors favor a finding of likelihood of confusion. While the evidence of expansion concerns Monster, rather than Dolby, it is the question of future expansion of product lines into the same markets, rather than who is planning to expand, that is the focus of this factor. *Official Airline Guides, Inc. v. Goss,* 6 F.3d 1385, 1394 (9th Cir. 1993) quoting *Sleekcraft,* 599 F.2d at 354 ("a strong possibility that either party may expand his business to compete with the other will weigh in favor of finding that the present use is infringing.")

4

1   Likewise, the parties agree that the record does not contain any evidence of actual confusion (factor
2   4 above), a factor weighing against likelihood of confusion.  Four of the eight *Sleekcraft* factors
3   remain.  The Court addresses each in turn.

   *1. Similarity of the Marks*

   The "similarity of the marks" factor considers the marks in their entirety, as they appear in the marketplace.  *GoTo.com, Inc. v. Walt Disney Co.,* 202 F.3d 1199, 1206 (9th Cir. 2000).  The inquiry focuses on the overall impression created by the mark, rather than the individual features. *adidas-Am., Inc. v. Payless Shoesource, Inc.*, 546 F. Supp. 2d 1029, 1052 (D. Or. 2008) citing *Exxon Corp. v. Texas Motor Exch., Inc.*, 628 F.2d 500, 505 (5th Cir. 1980).  Similarities between the marks are weighted more heavily than differences.  *GoTo.com,* 202 F.3d at 1206.

   Here, both marks consist of an icon of a pair of over-the-ear headphones surrounding an abstract geometrical shape.  The proportionate size of the headphone icon compared to the center geometric shape is approximately the same for both marks.  Both of the center geometric shapes have a similar dark, right-angle side nearest the headphones icon, with mirror-image, inward-facing, semi-circular arcs opposite the right-angle side.  Indeed, Monster's own witnesses concede that the marks have similar elements.  The evidence indicates that Monster's mark sometimes appears in a certain configuration with the Monster name or in certain color combinations, but sometimes does not.  In short, a reasonable jury could find, on the record before the Court, that this element favors likelihood of confusion.

   *2. Strength of the Dolby Mark*

   With respect to the strength of Dolby's Headphone Mark, the evidence before the Court would support a finding that the Dolby mark is strong.  Strength of a mark is determined by examining both conceptual and commercial strength.  *GoTo.com,* 202 F.3d at 1207.  "The stronger the mark—meaning the more likely it is to be remembered and associated in the mind with the mark's owner—the greater the protection it is accorded by the trademark laws." *Network Automation, Inc. v. Advanced Systems Concepts, Inc.* 638 F.3d 1137, 1149 (9th Cir. 2011).

   Conceptual strength of a trademark considers the distinctiveness of the mark, in that marks which are just descriptive, *i.e.* directly represent the product in a "straightforward way that requires no exercise of the imagination," are considered weaker while marks that are arbitrary or fanciful in

5

relation to the service or product are considered stronger and entitled to wider protection. *Kendall-Jackson Winery, Ltd. v. E. & J. Gallo Winery,* 150 F.3d 1042, 1047 n.8 (9th Cir. 1998); *Sleekcraft*, 599 F.2d at 349. Commercial strength considers the recognition value of the mark in the marketplace, which can transform a merely suggestive mark into a strong mark through significant advertising or other branding efforts. *Network Automation*, 638 F.3d at 1149.

Monster's motion focuses entirely on conceptual strength. Monster argues that the Dolby Headphone Mark is merely descriptive and therefore entitled to little protection. In Monster's view, the mark as a whole is weak because it incorporates a general design element that many other marks incorporate: a graphic representation of a set of headphones. This argument ignores that the mark must be considered in its entirety. *Cf. GoTo.com*, 202 F.3d at 1207 ("GoTo's logo may appear to be weakened by the fact that the term 'Go' and green 'Go' circles are certainly common sights on the Internet, but it is the mark in its entirety that must be considered—not simply individual elements of that mark.") The mark is not merely a pair of headphones standing on its own, but is a composite of an abstract "Double D" shape surrounded by a stylized headphone icon. A composite mark may be considered strong and distinctive, even if its individual elements would not be. *California Cooler, Inc. v. Loretto Winery Ltd,* 774 F.2d 1451, 1455 (9th Cir. 1985). Indeed, Monster offers exemplars offered showing other logos using a representation of headphones in their design which ironically *undercuts* Monster's argument. The notion that including headphones as part of a mark *per se* makes the mark more generic and weaker is undermined by the number of variations in shape, color, proportion and configuration with other design elements shown in the proferred examples.

Moreover, the Dolby Headphone Mark has been in use since 1999 and was registered in 2002. The parties agree that it has, by passage of time, become an incontestable mark pursuant to 15 U.S. C. section 1065. Though not conclusive on the question of likelihood of confusion, incontestability precludes a challenge on the grounds that the mark is merely descriptive. *Park 'N Fly, Inc. v. Dollar Park & Fly, Inc.*, 469 U.S. 189, 196 (1985).

Thus, the Court finds that there is a triable issue of fact as to the strength of the mark element, and a reasonable jury examining the record before the Court could find that it favors a likelihood of confusion.

*3. Degree of Consumer Care In Selecting Type of Goods*

This factor examines the type of goods and the degree of care likely to be exercised by the purchase, with a higher degree of care supporting a lower likelihood of confusion and "lower consumer care ... increas[ing] the likelihood of confusion." *Network Automation,* 638 F.3d at 1152 quoting *PlayboyEnters., Inc. v. Netscape Commc'ns Corp.,* 354 F.3d 1020, 1028. "In assessing the likelihood of confusion to the public, the standard used by the courts is the typical buyer exercising ordinary caution." *Id.* quoting *Sleekcraft,* 599 F.2d at 353. "When the buyer has expertise in the field. . . or when the goods are expensive, the buyer can be expected to exercise greater care in his purchases. . . though, confusion may still be likely." *Network Automation,* 638 F.3d at 1152 (citing *Brookfield Communications, Inc. v. W. Coast Entm't Corp.*, 174 F.3d 1036, 1060 (9th Cir. 1999) [when products are marketed primarily to "expert buyers," the likelihood those buyers will be confused about the product's source decreases]). Thus a court must consider both the nature of the goods and the type of product. Indeed, when the products themselves are very similar, and the marks are as well, sophistication of the typical buyer alone cannot be relied on to prevent confusion. *McGregor-Doniger Inc. v. Drizzle Inc.*, 599 F.2d 1126, 1137-38 (2d Cir. 1979) (citing *Omega Importing Corp. v. Petri-Kine Camera Co.,* 451 F.2d 1190, 1195 (2d Cir. 1971) ["though the ordinary purchaser would be expected to make "more than a casual inspection" before buying an expensive camera, such inspection would be of doubtful value because the cameras from each of two different sources were both labeled 'Exakta'"].)

Here, Monster argues that the price range for its headphones, which retail between $100 and $299 or more per product, is relatively expensive and indicates that consumers can be expected to exercise greater care in selecting a product. Monster also offers evidence that a large proportion of consumers buying headphones in this price range tend to research their purchases in advance. The evidence in the record also shows that Monster currently sells products in a variety of market segments, including the "young-and-trendy" and the "business/professional" markets. (Lazatin Decl. Ex. XX.) Monster also has plans to expand into the "gaming" market segment. (Lazatin Decl. Ex. F at 220.) Headphones bearing the Dolby mark sell in the same price range and to the same market segments. Moreover, the Dolby mark may appear on a variety of different headphone styles, including styles similar to Monster's, since Dolby licenses its mark to different headphone

7

1 manufacturers. This adds to the potential for source confusion, whatever the sophistication level of
2 the buyers.
3       On the one hand, the cost of the products and the evidence of pre-purchase research indicate a
4 more-than-casual purchaser who might be expected to note more carefully the source of these types
5 of goods. On the other hand, the target markets for these goods are average consumers, not experts.
6 To the extent that Monster's headphones can be said to be "high-end," so can headphones bearing
7 the Dolby mark. Accordingly, the Court finds that the degree of consumer care factor is neutral in
8 the overall analysis.

*4. Monster's Intent In Selecting Its Mark*

Proof of intent to confuse or deceive consumers is not necessary to establish trademark infringement, and lack of such intent adds nothing to the likelihood of confusion analysis. *See GoTo.com,* 202 F.3d at 1208. However, where the evidence suggests intent to deceive, this factor supports a finding of likelihood of confusion. *Interstellar,* 184 F.3d at 1111; *Sleekcraft,* 599 F.2d at 354.

First, "[w]hen the alleged infringer knowingly adopts a mark similar to another's, reviewing courts presume that the defendant can accomplish his purpose: that is, that the public will be deceived." *Network Automation, Inc. v. Advanced Sys. Concepts, Inc.*, 638 F.3d 1137, 1153 (9th Cir. 2011) quoting *Sleekcraft,* 599 F.2d at 354; *see also Interstellar Starship Services, Ltd. v. Epix Inc.*, 184 F.3d 1107, 1111 (9th Cir. 1999) ("[a]dopting a designation with knowledge of its trademark status permits a presumption of intent to deceive"); *Mine O'Mine, Inc. v. Calmese*, 2:10-CV-00043-KJD, 2011 WL 2728390 (D. Nev. July 12, 2011) *aff'd,* 11-17972, 2012 WL 6053150 (9th Cir. Nov. 21, 2012) citing 4 J. Thomas McCarthy, *McCarthy on Trademarks and Unfair Competition* (4th Ed. 2010) §23.115 ["*McCarthy*"] ("[i]t is easy to infer wrongful intent when the defendant 'knew of plaintiff's mark, had freedom to choose any mark and 'just happened' to choose a mark confusingly similar to plaintiff's mark.'").

Based upon the record before the Court here, a reasonable jury could find that Monster intentionally adopted a mark similar to the Dolby Headphone Mark, thus creating a triable issue. Monster was aware of the Dolby Headphone Mark at the time that it adopted its Monster Headphone Mark. It had, in fact, licensed and used the Dolby Headphone Mark on its own products. The record

8

contains conflicting accounts about the creation of the Monster Headphone Mark. Dolby also offers evidence that Monster previously admitted using a different Dolby mark without permission,[3] as well as evidence that Monster acknowledged the value of including the Dolby Headphone Mark and Dolby technology in marketing headphones to consumers. This and other circumstantial evidence would allow a reasonable jury to find in favor of Dolby on the intent to confuse factor. Moreover, to the extent that evaluation of the evidence on this factor requires weighing the credibility of Monster's witnesses, that task must be left to a jury.

### D. Conclusion

Here, based upon the record before the Court, a reasonable jury could find that a majority of the factors, and the key factors, favor a finding of likelihood of confusion.

As set forth above and taking into account the full record before the Court,[4] a jury could reasonably find for Dolby on a majority of the *Sleekcraft* factors – similarity of the marks, strength of the Dolby Headphone Mark, degree of consumer care in selecting products of this type, Monster's knowing selection of a similar mark and intent to confuse, proximity of the goods in the marketplace, similarity of marketing channels used, and likelihood of expansion into overlapping areas. Certainly Monster's survey evidence of lack of confusion among a sample of likely purchasers is compelling. However, that evidence is not dispositive. Accordingly, the Court finds rational trier of fact could find that confusion between the source of the products with these marks is probable, not merely possible. *See M2 Software, Inc., v. Madacy Entm't,* 421 F.3d 1073, 1084 (9th Cir. 2005). Accordingly, Monster's motion for summary judgment is **DENIED**.

### II. DOLBY'S MOTION FOR PARTIAL SUMMARY JUDGMENT

Dolby moves for partial summary judgment on Monster's theories of naked licensing, part of the basis for Monster's declaratory relief claims of no confusion and no infringement, as well as its

---

[3] Monster makes an ambiguous objection to this evidence on the grounds that is offered to show that Monster later acted "in accordance with [its] character," Fed. Rule Evid. 401, 404 (a) & (b). The objection is **OVERRULED**. The evidence can be considered to show that Monster was aware of the value of using a Dolby mark on its products, as well as awareness of the appearance of a related, though separate, Dolby mark.

[4] Monster's objection to Exhibit A to the Declaration of Chris Kukshtel is **OVERRULED** since the discovery request sought surveys concerning recognition of the Dolby mark and, as Monster itself notes, the exhibit is a survey concerning consumer recognition of Dolby technology. Monster's objection to Exhibit KK to the Declaration of Carlos Lazatin is **SUSTAINED** on hearsay grounds.

9

seventh claim for abandonment under 15 U.S.C. section 1115, and for partial summary judgment as to Monster's affirmative defense of aesthetic functionality.

### A. Naked Licensing Defense

Monster alleges that Dolby abandoned its trademark rights in the Dolby Headphone Mark because Dolby failed to exercise adequate control over its licensees. *FreecycleSunnyvale v. Freecycle Network*, 626 F.3d 509, 515 (9th Cir. 2010). Under the theory of naked licensing, if a trademark owner fails to control the quality of the goods and services sold under that trademark by its licensees, the trademark may cease to function as a symbol of quality and source for consumers and effectively be considered to have been abandoned. *Id.* at 515-16 citing *Barcamerica Intern. USA Trust v. Tyfield Importers, Inc.,* 289 F.3d 589, 595-96 (9th Cir. 2002) and *McCarthy* § 18:48. Thus, the naked licensing claim is fundamentally a claim that the trademark is no longer valid and enforceable because of the licensor's neglect in policing its use. The court must consider whether there has been adequate quality control, that is whether the trademark holder played a "meaningful role in holding the. . . [product] to a standard of quality." *Barcamerica*, 289 F.3d at 598.

The Ninth Circuit has not settled on an exact standard of proof required for establishing a naked licensing claim, declining to hold expressly whether the standard is "clear and convincing evidence" or a preponderance. *FreecycleSunnyvale,* 626 F.3d at 514-15. However, because the theory is essentially one of forfeiture of trademark rights, the Ninth Circuit has described the standard required of the trademark challenger as "stringent." *FreecycleSunnyvale,* 626 F.3d at 514 quoting *Barcamerica,* 289 F.3d at 596. Moreover, Monster, as the party asserting the claim, bears the burden to prove naked licensing with evidence that meets that stringent standard. *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 254, (1986).

Dolby first argues that Monster is estopped from claiming naked licensing based upon a failure to police the quality of *Monster's* use of the trademark. The licensee estoppel doctrine precludes a licensee from challenging the validity of the licensor's trademark based upon conduct that occurred during the life of its license, particularly with respect to the licensee itself. *See Pacific Supply Coop. v. Farmers Union Cent. Exch.,* 318 F.2d 894, 908 (9th Cir.1963); *STX, Inc. v. Bauer USA, Inc.*, C 96-1140 FMS, 1997 WL 337578 at *10 (N.D. Cal. June 5, 1997); *Creative Gifts, Inc. v. UFO*, 235 F.3d 540, 548 (10th Cir. 2000); *Prof'l Golfers Ass'n of Am. v. Bankers Life & Cas. Co.*,

10

514 F.2d 665, 671 (5th Cir. 1975). Thus, at a minimum, any evidence that Dolby failed to police *Monster's* use of the Dolby Headphone Mark would be irrelevant.

Assuming Monster may nevertheless challenge the validity of the trademark based upon evidence of Dolby's failure to police others' use of the mark, the evidence in the record does not create a triable issue, given the stringent showing that Monster must make to support such a claim. First, Dolby offers evidence that it requires licensees to enter into an agreement to abide by its guidelines for use of the mark and use of the Dolby headphone technology. (*See* Dolby Separate Statement of Material Facts and evidence cited therein ["Dolby Fact"] Fact Nos. 17-20, 28-31, 33, 34, 44.) Dolby requires licensees to submit prototype products for testing to ensure that they meet Dolby's quality standards before they can use the mark. (Dolby Fact Nos. 29, 41.) Dolby also verifies that the licensee has the capacity to integrate and distribute the Dolby technology at a level that meets Dolby's quality standards. (Dolby Fact Nos. 28, 29, 31.) Dolby collects detailed information on products, testing equipment used by licensees, as well as their quality control processes. (Dolby Fact Nos. 28, 33.) Some prototypes are disapproved if they do not meet the trademark standard or the quality standards, and Dolby does not issue production-level chips for its technology until a prototype is approved. (Dolby Fact Nos. 36-39; 40.)

With respect to the use of the mark itself, Dolby's requires licensees to abide by certain guidelines for its use and display. (*See* Dolby Fact Nos. 17-20, 22, 24-30, 34, 44, 45.) Dolby employs a program of monitoring use of its mark, as well as identifying similar, potentially confusing marks, in the marketplace using monitoring software, a compliance team in the field, evaluation of customer reports, and partnering with customs officials. (Dolby Fact Nos. 43, 46.) Dolby also engages in enforcement efforts when it finds unauthorized use of a Dolby mark. (Dolby Fact Nos. 47-51.)[5]

Monster counters that Dolby's efforts are sporadic and inconsistent by raising several instances it contends are evidence of failure to exercise adequate control over its licensees. For instance, Monster argues that Dolby permitted a company to use the Dolby Headphone Mark without completing testing or entering into an agreement. However, a more neutral evaluation of the

---

[5] While Monster argues that these facts are disputed, none of its arguments or objections undercut the materiality of the evidence offered by Dolby.

evidence shows that Dolby permitted a long-time business partner to continue using the mark when one of its several active licenses expired for a five-month period before the renewal process was completed. (Declaration of Patrick Rossi ["Rossi Dec."][6], ¶18-20; Declaration of Alfredo Perez de Alejo ["Perez de Alejo Dec."], Exh. U [Rossi Deposition] at 291-292.) A close or long-standing working relationship with a licensee, where the licensor can rely on the licensee's quality control, may stand in for a formal agreement in certain circumstances. *Cf. FreecycleSunnyvale*, 626 F.3d at 518. Thus the evidence here could not satisfy the "stringent proof" necessary to show naked licensing.

Monster also argues that Dolby did not uniformly apply its quality control measures, allowing some licensees to bypass certain tests and requirements. The evidence regarding testing of licensee applicants and Dolby's responses to those applicants actually tends to show that Dolby has used adequate quality control measures, and indeed requires extensive and highly technical quality testing of products carrying the mark. (*See* Perez de Alejo Dec., Exh J at DLB00008040 [flagging testing issue but finding other tests showed acceptable performance on this issue] and DLB000008038-42 [ultimately not approving product for other reasons]; *see also id.*, Exh. H, K, L, T [examples of evaluation reports showing battery of tests required of prototype products].) That Dolby tested the product, reviewed the results, and "waived" results of one test does not indicate a failure to monitor product quality associated with the mark.

Other alleged instances of Dolby's failure to police its mark lack evidentiary support. Monster relies on the testimony of Dolby's brand manager which Monster characterizes as stating that because Dolby's mark appears on multiple products worldwide, he had no way of monitoring the mark. However, when viewed in its context, the testimony of Senior Dolby Brand Manager Chris Kukshtel was that he could not recall the exact placement of the Dolby Headphone Mark on all major licensee's products, not that Dolby was unable to monitor all of the products using the mark. (Declaration of Carlos M. Lazatin, Exh. D [Kukshtel Depo] at 42; *see also* Declaration of Chris Kukshtel at ¶ 4; Rossi Dec. ¶10.) Likewise, although Monster argues that Dolby improperly allowed licensees to use the Dolby Headphone Mark on products that did not contain Dolby headphone

---

[6] Dolby's objections to the Rossi Declaration as lacking foundation and offering improper expert opinion are **OVERRULED**.

technology, the evidence indicates that the mark was used on product using the Dolby Mobile suite, which includes Dolby headphone technology. (*See* Lazatin Reply Dec., Exh. N at 142 and Kukshtel Dec. ¶ 7.)

Finally, even accepting Monster's evidence as showing lapses or exceptions in Dolby's policing of its trademark and product quality, such a showing would not rise to a level sufficient to establish abandonment of quality control efforts and naked licensing. *See Heaton Distrib. Co. v. Union Tank Car Co.*, 387 F.2d 477, 485 (8th Cir. 1967) ("mere fact that in a few instances former franchised dealers did not cease the use of the Lindsay trademark or trade name immediately upon the cancellation of their agreement" did not establish naked licensing); *see also Hurricane Fence Co. v. A-1 Hurricane Fence Co., Inc.*, 468 F. Supp. 975, 989 (S.D. Ala. 1979) ("to impose upon the mark owner the duty of monitoring every sale of every dealer to regulate its use of the mark would be unconscionable"). The Court need not require numerous mini-trials on all of the policing efforts if sufficient evidence establishes that the mark has not been effectively abandoned.

In summary, Monster has not put forth sufficient evidence to create a triable issue of fact on the naked licensing theory. Thus, partial summary judgment is **GRANTED** in favor of Dolby on the first, second and seventh claims in Monster's FAC to the extent they rely on a naked licensing theory.

### B. Aesthetic Functionality Defense

Monster raises an affirmative defense that Dolby's claims are barred because "the use of headphones as a design element in a mark used in connection with consumer electronics products is not a protectable element of a mark because it is generic and/or aesthetically functional." (Monster's Answer, Dkt. No. 15, at p. 6.) The defense is word-for-word identical to the allegation in Monster's original complaint for declaratory relief. (Monster's Complaint, Dkt. No. 1, at p. 4:22-24.)

The Court previously rejected this defense in its Order Granting Dolby's Motion for Judgment on the Pleadings. (Dkt. No. 37.) The Court now reiterates what it previously ruled on this issue and should by now be exceedingly clear: the theory that one can sever the different elements of a design and analyze them separately to determine whether the mark as a whole is protectable is contrary to the law of the Ninth Circuit. *See GoTo.com*, 202 F.3d at 1207 ("it is the mark in its entirety that must be considered— not simply individual elements of that mark"); *Official Airline*

1  *Guides, Inc. v. Goss*, 6 F.3d 1385, 1392 (9th Cir. 1993) ("under the anti-dissection rule, the validity
2  and distinctiveness of a composite trademark is determined viewing the trademark as a whole, as it
3  appears in the marketplace."). A mark is not rendered unprotectable simply because it may be made
4  up of one or more generic elements. *GoTo.com*, 202 F.3d at 1207 (holding that GoTo's logo is a
5  strong mark despite "the fact that the term 'Go' and green 'Go' circles are certainly common sights
6  on the Internet"); *Cal. Cooler*, 774 F.2d at 1455 ("the composite may become a distinguishing mark
7  even though its components individually cannot.")

8  Thus, as a matter of law, the affirmative defense is untenable. Dolby's Motion for Partial
9  Summary Judgment of this fourth affirmative defense is therefore **GRANTED**.

## CONCLUSION

11  For the foregoing reasons, Monster's Motion for Summary Judgment is **DENIED** and Dolby's
12  Motion for Partial Summary Judgment and to Monster's naked licensing claims and its aesthetic
13  functionality defense is **GRANTED**.

14  **IT IS SO ORDERED.**

15  Dated: January 29, 2013

16  **YVONNE GONZALEZ ROGERS**
   **UNITED STATES DISTRICT COURT JUDGE**